AO 108 (Rev. 06/09)  Application for a Warrant to Seize Property Subject to Forfeiture

FILED
RICHARD W. NAGEL
CLERK OF COURT

# UNITED STATES DISTRICT COURT

2016 DEC -7  AM 10: 01

### for the

### Southern District of Ohio

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WESTERN DIV. DAYTON

| | | |
|---|---|---|
| In the Matter of the Seizure of | ) | |
| *(Briefly describe the property to be seized)* | ) | |
| 2007 Nissan Titan Truck, VIN #1N6BA07A07N245525 | ) | Case No. 3 : 16 mj 355 |
| in the name of John Ward | ) | |
| | ) | |

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the _____Southern_____ District of _____Ohio_____ is subject to forfeiture to the United States of America under _____18_____ U.S.C. § _____981(a)(1)(A) and (C)_____ *(describe the property)*:
and 31 U.S.C. § 5317(c)

The application is based on these facts:

See attached affidavit

☑ Continued on the attached sheet.

_____
*Applicant's signature*

Matthew L. Schierloh, S.A. United States Secret Service
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

_____
*Judge's signature*

City and state: Dayton, Ohio

Michael J. Newman, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT

I, Matthew L. Schierloh, being duly sworn, depose and state:

## I. INTRODUCTION

1.      I am a Special Agent of the United States Secret Service ("USSS") and have held this position since November 2004.  As a special agent, I have received training in the investigations of white collar crimes, including bank fraud, mail fraud, wire fraud, embezzlement, and money laundering.  I have participated in the investigation of financial crimes involving, among others things, employee embezzlement from federally insured financial institutions and other commercial businesses.  I have participated in the execution of search warrants involving financial crimes and have interviewed individuals that have perpetrated frauds against businesses and banks.  I currently serve on the Southern Ohio Electronic and Financial Crimes Task Force. In this capacity, I routinely interact and have discussions with other law enforcement officers who have substantial experience and training in the investigation and prosecution of white collar crimes.  Prior to my employment as an agent with the Secret Service, I served with the United States Secret Service Uniformed Division for approximately five (5) years.

2.      Based on my training, experience and participation in financial investigations, and based upon the experience and knowledge of other agents and officers of the Southern Ohio Electronic and Financial Crimes Task Force, who were involved with this investigation from its onset, I know:

      a.      That individuals who receive funds from a particular crime will attempt to legitimize the proceeds of the crime by depositing the funds into bank accounts in nominee names. These individuals will often launder the funds through these nominee bank accounts in an attempt to further conceal the disposition of the funds.

      b.      That individuals who receive funds from a particular crime will attempt to conceal the disposition of these funds by purchasing personal assets with cash.  These individuals use, control and maintain these assets in their residences and will maintain receipts from these assets in their residences.  These documents include car titles and deeds.

      c.      If an individual has removed bulk currency from a bank, it tends to come banded (i.e., in a money strap or band).  After removing money from the bank, the individual often retains the band on the currency until the currency is accessed.

      d.      In the modern era, people bank online, conduct transactions online, make travel arrangements, access to overseas banks and check credit card statements on line.

      e.      When individuals embezzle money,  particularly in the form of US currency, they are unlikely to deposit all of it into bank accounts for fear of alerting authorities.  As such, cash embezzlers often keep bulk currency at their residence, in safes, vehicles, etc.

## II. PURPOSE OF AFFIDAIVT

3.      I make this affidavit in support of:

a.      the seizure of the following assets:

(1)  Account Heartland Federal Credit Union #6490, all contents in the approximate amount of $52,748.00 (HFCU #6490);

(2)  1991 240 Islander Boat, ID #AGCC6988J091;

(3)  2011 Outback Camper, ID #4YDT31228BB451688; and

(4)  2007 Nissan Titan Truck, VIN #1N6BA07A07N245525.

b.      as there is probable cause to believe SCARPELLI and others committed the following violations:

(1)   18 U.S.C. § 656 (Bank Embezzlement);

(2)   18 U.S.C. § 1005 (Fraudulent Bank Transactions);

(3)   18 U.S.C. § 1343 (Wire Fraud);

(4)   18 U.S.C. § 1344 (Bank Fraud);

(5)   18 U.S.C. § 371 (Conspiracy);

(6)   31 U.S.C. § 5324(a)(3) (Structuring a Financial Transaction);

(7)   31 U.S.C. § 5324(a)(1) (Causing Financial Institution to Evade Reporting Req.);

(8)  18 U.S.C. § 1956 (Money Laundering);

(9)  18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering); and

(10)  18 U.S.C. § 1957 (Laundering Monetary Instruments in Excess of $10,000.00);

c.      and the assets are subject to forfeiture pursuant to:

(1)  18 U.S.C. § 981(a)(1)(C)(civil forfeiture) as property, real or personal which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 656 (Bank Embezzlement), 18 U.S.C. § 1005 (Fraudulent Bank Transactions) or any offense constituting "specified unlawful activity" ("SUA") as defined in 18 U.S.C. § 1956(c)(7) which includes 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. § 1344 (Bank Fraud);

18 U.S.C. § 1956 (Money Laundering), 18 U.S.C. § 1957 (Laundering SUA Proceeds in Excess of $10,000.00); or a conspiracy to commit such offense;

(2) 18 U.S.C. § 981(a)(1)(A)(civil forfeiture) as property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956 or 18 U.S.C. § 1957, or any property traceable to such property; and

(3) 31 U.S.C. § 5317(c)(2)(civil forfeiture) as property involved in a violation of 31 U.S.C. § 5313 or 31 U.S.C. § 5324, or any conspiracy to commit such violation, and any property traceable to any such violation or conspiracy.

4.    This affidavit is intended to show only that there is sufficient probable cause for the seizure and does not purport to set forth all of my knowledge of, or investigation into, this matter. The facts and information contained in this affidavit are based on, among other things, my personal knowledge, my training and experience, as well as my conversation with various witnesses, including law enforcement personnel who have participated in this investigation, and the review of certain documents and records.

## III. VIOLATIONS

5.    During April 2014, your Affiant was advised by West Carrollton Police Department ("WCPD") Detective Bob Bell that an employee of US Bank at 515 East Central Avenue, Miamisburg, Ohio ("Miamisburg Branch") had embezzled over $5,000,000.00. Over the following months, your Affiant and Detective Bob Bell have participated in numerous conversations with representatives of US Bank concerning SCARPELLI's illegal activities.

6.    At all times relevant, the US Bank Miamisburg Branch was insured by the Federal Deposit Insurance Corporation (FDIC).

7.    Your Affiant's investigation revealed that after SCARPELLI'S promotion to branch manager and continuing through on or about April 23, 2014, SCARPELLI embezzled money from US Bank, by engaging in a pattern of fraudulent financial transactions, including withdrawing funds in increments of $25,000.00 to $45,000.00 from US Bank's Loan In Transit (LIT) account, which SCARPELLI fraudulently represented were withdrawals to cover a business customer's usage of its line of credit, and which SCARPELLI fraudulently represented were paid back by the customer (hereinafter "RRSI"). However, SCARPELLI was in fact using RRSI's account to conduct fraudulent transactions resulting in a loss of more than $5,000,000.00 from US Bank in violation of 18 U.S.C. § 656 (Bank Embezzlement); 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. § 1344 (Bank Fraud) and 18 U.S.C. § 1005 (Fraudulent Bank Transactions)

8.    SCARPELLI structured out the $25,000.00 to $45,000.00 withdrawals and avoided triggering US Bank's obligation to file a Currency Transaction Report (CTR) by creating an elaborate series of cashier's checks and CASH OUT CREDIT tickets in amounts less than $10,000.00 in violation of 31 U.S.C. § 5324(a)(Structuring).

9.     SCARPELLI, her current domestic partner DEANNA LEIS and others engaged in money laundering and a money laundering conspiracy in violation of 18 U.S.C. § 1956(h) by:

a.     depositing the cash proceeds of the violations into bank accounts in order to conceal or disguise the source of the cash; and by concealing the nature, source, location, ownership or control of the assets purchased with the proceeds of the violations by putting the assets in nominee names, all in violation of 18 U.S.C. § 1956; and

b.     spending $10,000.00 or more of the proceeds of the violations to acquire assets in violation of 18 U.S.C. § 1957.

## BANK EMBEZZLEMENT

10.     Between approximately 1996 and April 30, 2014, SCARPELLI worked at the US Bank Miamisburg Branch holding various positions at the financial institution. Beginning in approximately 2005, US Bank promoted SCARPELLI to a Level II branch manager at the Miamisburg Branch. In this capacity, SCARPELLI had the ability to authorize certain financial transactions absent approval from any other bank official.

11.     During an audit, US Bank found that over $5,000,000.00 in US currency was taken from the Miamisburg Branch by means of SCARPELLI creating LIT transactions in amounts less than $50,000.00; creating and signing cashier's checks and "CASH OUT CREDIT" tickets totaling the amount of the LIT transaction; cashing those cashier's checks in a series of smaller checks and taking cash of out the teller drawer using "CASH OUT CREDIT" tickets in amounts that were always $10,000.00 or less.

12.     Your Affiant's investigation revealed that beginning on or about 2009 and continuing through April 30, 2014:

a.     SCARPELLI used the line of credit account of a business identified herein as RRSI to withdraw funds from the LIT account purportedly to fund RRSI's withdrawals on its line of credit;

b.     Within 5 days from the validation of the LIT transaction, SCARPELLI would post the withdrawal to RRSI's line of credit account so that the Proofing Department would see that the LIT withdrawal had been logged against RRSI's account, the payment would be credited to the LIT GL Account, the LIT transaction would clear, and the monitoring would cease;

c.     SCARPELLI wrote cashier's checks for the amount of the LIT transactions and "CASH OUT CREDIT" tickets in amounts of less than $10,000.00 to obtain the cash for the LIT transaction (typically $45,000.00 or $25,000.00) and avoid triggering the bank's requirement to file of a currency transaction report;

d.     SCARPELLI made false entries in US Bank's computer system to make it appear that RRSI's account was debited for the LIT withdrawal, clearing out the LIT withdrawal from the LIT GL Account and allowing her to keep the cash from the LIT transaction;

     e.     SCARPELLI made false entries to RRSI's line of credit account to make it appear that the company had repaid the line of credit withdrawal which prevented RRSI from receiving a monthly statement that would have revealed that it's line of credit account had been used; and

     f.     SCARPELLI used the Commercial Loan Workstation (CLW) to create LIT withdrawals which she would enter manually. For these withdrawals, SCARPELLI did not validate that LIT ticket or send it down to Cincinnati. SCARPELLI created a fictitious serial numbers for these LIT transactions. Creating these LIT transactions manually, and failing to validate the transactions allowed SCARPELLI to steal the cash from these LIT transactions.

13.     All of the fraudulent transactions were conducted by SCARPELLI at the Miamisburg Branch using her employee identification number, FN7484. The withdrawals from the LIT were never more than $45,000.00.

14.     Between on or about 2010 and continuing through April, 2014, SCARPELLI routinely stopped other employees from shipping large denomination currency, (100's and 50's), from the vault of the Miamisburg Branch. US Bank generally required its branches to refrain from keeping bulk quantities of large denomination currency on hand in its vaults. In the course of stopping the employees from following US Bank's requirements, SCARPELLI falsely explained that she had a number of business customers who frequently requested large cash withdrawals. US Bank determined that, during this time, it was ordering unusually large amounts of currency for delivery to the Miamisburg Branch.

15.     After the embezzlement was discovered, bank employees told your Affiant they finally understood why they always had so much trouble keeping the appropriate level of cash in the bank. SCARPELLI often asked the other employees for large amounts of cash to use at her teller window and would go through multiple straps of 100's and 50's a day. When questioned, SCARPELLI would say she needed the cash for a business customer or for a large withdrawal. One employee stated that they had issues with the cash tracking system because they couldn't keep the cash levels each week consistent. It didn't make sense to the employees how much currency the bank consistently went through. Keeping the cash at the appropriate level was a struggle because the employees wanted to ship out a lot more cash and order less. But, SCARPELLI insisted that the branch would go through the money each week. One employee said she had to order at least $10,000.00 in 100's and $10,000.00 in 50's each week and some weeks as much as $30,000.00 in $100's and $50's. SCARPELLI would tell the employees that she would have "special" requests from regular business customers for large checks or she would get $5,000.00 to $6,000.00 withdraws when she ran regular teller transactions. SCARPELLI knew each week how much money they needed to send out in order for the tracker to balance.

16.     When SCARPELLI was on vacation, the bank's cash levels would be higher.

17.   After SCARPELLI was fired, the bank had to ship out a lot more money to keep the cash tracking system at the optimal level.

## FRAUDULENT BANK TRANSACTIONS, BANK FRAUD, WIRE FRAUD

18.     US Bank's internal audit determined that SCARPELLI used the LIT account in conjunction with business customers lines of credit to withdraw, i.e., steal, in excess of five million dollars ($5,000,000.00) from US Bank.  SCARPELLI conducted these transactions using her employee ID# FN7484 at the Miamisburg Branch.  It appears that SCARPELLI started as early as 2007 to steal from the bank.  However, when RRSI closed its checking account in November 2011 but it's line of credit account was not closed, SCARPELLI used the LIT account on an almost daily basis to fund fraudulent withdrawals.

19.     A review of the LIT GL account for all of the LIT transactions made in the name of RRSI shows that it was always SCARPELLI that created, issued, and finalized each and every LIT transaction on behalf of RRSI.

20.     As noted above, the LIT account was supposed to be replenished within 5 days with a debit against the business customer's line of credit account.  If it was not, the issue would start getting worked and the commercial loan department would contact the person who originated the loan.  If it hits the sixteenth day, the matter gets escalated.  Consequently, it was important to timely restore the LIT.

21.     SCARPELLI created false entries into US Bank's computer system to make it appear that RRSI's line of credit had been debited for the withdrawal from the LIT account.  However, the payments were not real.

22.     When the commercial loan department did contact SCARPELLI regarding a withdrawal from the LIT account that had not been timely repaid, SCARPELLI created a false electronic entry to make it appear the customer's line of credit account had been debited.

## STRUCTURING, AVOIDING CTRS

23.     Your Affiant knows that Title 31, United States Code, Section 5313 and 31 C.F.R. Part 103 of the Bank Secrecy Act (BSA) require any financial institution that engages with a customer in a currency transaction (i.e., a deposit or withdrawal) in excess of $10,000.00 to report the transaction to the Internal Revenue Service on Form 4789. The Report is called a Currency Transaction Report ("CTR").

24.     CTRs are often used by law enforcement to uncover a wide variety of illegal activities including narcotics trafficking and money laundering.  Many individuals involved in these illegal activities are aware of such reporting requirements and take active steps to cause financial institutions to fail to file CTRs.  These active steps are often referred to as "structuring" and involve making multiple cash deposits or withdrawals in amounts less than $10,000.00. Structuring is prohibited by 31 U.S.C. § 5324.

25.     In order to establish the crime of structuring transactions to evade reporting requirements, the government must prove that, for the purposes of evading the reporting requirements of Sections 5313(a) or any regulation prescribed under any such section, the subject structured or

assisted in structuring, or attempted to structure or assist in structuring, any transaction with one or more domestic financial institutions in amounts less than $10,000.00.

26. When SCARPELLI made the initial withdraw from the LIT account to purportedly fund a line of credit advance by RRSI, the withdrawal was typically paid in two portions, a cashier's check and the other portion was generally cash in an amount under $10,000.00.

27. Each cashier's check was created by SCARPELLI using the cashier's check machine located at her teller window.

28. SCARPELLI structured out the cash from her withdrawals against RRSI's line of credit and the LIT account in the following manner. When making a withdrawal in the amount of $45,000.00, the $45,000.00 would be paid with a $37,000.00 cashier's check and $8,000.00 cash out. Then the initial $37,000.00 cashier's check would be broken down into second cashier's check and cash out under $10,000.00. For example, the $37,000.00 cashier's check would be broken down into a $28,000.00 cashier's check and $9,000.00 cash out. The second cashier's check ($28,000.00) would then be broken down into a third cashier's check and second cash out of under $10,000.00. For example, the $28,000.00 cashier's check would be broken down to a $19,000.00 cashier's check and $9,000.00 cash out. This pattern would continue until the total withdraw against the LIT account was paid out in cash. For example, the third cashier's check ($19,000.00) would be broken down into a fourth cashier's check, say in the amount of $9,200.00 and $9,800.00 cash. Finally, the fourth cashier's check in the amount of $9,200.00 would be cashed.

## SCARPELLI'S TERMINATION

29. On April 18, 2014, US Bank employees escorted SCARPELLI out of the building.

30. On April 23, 2014, US Bank interviewed SCARPELLI concerning the over $5,000,000.00 in fraudulent transactions conducted using RRSI's line of credit. SCARPELLI admitted to conducting transactions on RRSI's account, including initiating LIT tickets and issuing cashier's checks. SCARPELLI admitted that she would advance funds to RRSI and would use the LIT account to assist RRSI in getting a line of credit advance. SCARPELLI admitting to sometimes advancing funds when RRSI's line of credit had been exceed. SCARPELLI also admitted that if she was contacted by the LIT Reconciliation Department regarding a LIT transaction that was pending for an item over 5 days, and RRSI did not have sufficient credit availability, she would debit from the LIT again to pay RRSI's line of credit and then would turn around and debit from the line of credit to pay the original outstanding debt. SCARPELLI was placed on administrative leave.

31. SCARPELLI claimed during her interview that an individual identified herein as D.J.C., a relation of RRSI's owner, had requested each draw on the line of credit and D.J.C. had personally come to US Bank and retrieved from her the cash corresponding to the draw. SCARPELLI acknowledged that D.J.C. was not an authorized signatory on the line of credit. When US Bank asked SCARPELLI if she essentially had given an individual over $5,000,000.00 more than to which he was entitled, she responded "Yes."

32. On April 30, 2014, SCARPELLI was terminated. On that date, US Bank employees found two (2) cashier's checks totaling $36,000.00 ($17,000.00 and $19,000.00) both payable to US Bank in SCARPELLI'S office.

33. The stealing discontinued in April 2014 when SCARPELLI was caught and fired.

### IV. LAUNDERING THE MONEY

34. Based on my training and experience, I know that, in the investigation and prosecution of embezzlement cases, evidence of unexplained wealth and spending often are indicative and corroborative of this type of criminal activity. I also know that, while stealing funds from their employers, individuals often begin spending money well above their legitimate financial means by purchasing real and personal property, including, but not limited to: vacation homes, jewelry, cars, boats, motorcycles, electronic equipment, or high end clothing; taking multiple extended and expensive trips that involve cruises, high end hotels, airline travel, or gambling; using cash to make these purchases; and providing purported gifts in the form of cash payments, homes, personal property, trips and vacations, to friends and family members.

35. Your Affiant obtained and reviewed US bank records maintained regarding the embezzlement. The records reflect that during the period of April 1, 2010 through April 23, 2014 when SCARPELLI was terminated, approximately $5,215,000.00 was fraudulently withdrawn by SCARPELLI from the LIT account. SCARPELLI structured out the $5,215,000.00 by writing a series cashier's checks in increasingly lower denominations and a series of CASH OUT CREDIT tickets so that she never withdrew cash in an amount greater than $10,000.00 which would trigger a CTR.

36. The $5,215,000.00 that SCARPELLI embezzled from US Bank was taken during the following time periods:

| YEAR | LOSS |
|---|---|
| 4/1/2010 – 12/31/2010 | $    65,000.00 |
| 1/1/2011 – 12/31/2011 | $  602,000.00 |
| 1/1/2012 – 12/31/2012 | $1,903,000.00 |
| 1/1/2013 – 12/31/2013 | $2,091,000.00 |
| 1/1/2014 – 4/23/2014 | $  554,000.00 |

Total - $5,215,000.00

37. SCARPELLI, LEIS and others laundered the money that SCARPELLI stole by:

a. depositing the cash proceeds of the violations into bank accounts in order to conceal or disguise the source of the cash; and by concealing the nature, source, location, ownership or control of the assets purchased with the proceeds of the violations by putting the assets in nominee names, all in violation of 18 U.S.C. § 1956; and

b.        spending $10,000.00 or more of the proceeds of the violations to acquire assets in violation of 18 U.S.C. § 1957.

38.     As a result of the illegal activity described above, SCARPELLI and LEIS lived an extravagant lifestyle in that:

a.        they gambled extensively, traveled frequently, and treated their large social network of friends that revolved around their house in West Carrollton and the camp ground and lake house at Lake Waynoka, OH to drinking and dining and cruises; and

b.        the cash flowed freely, allowing them to acquire expensive toys such as boats, camping trailers, motorcycles, trucks and classic cars and allowing them to buy a lake house and build a large barn to house their toys.  Most of the purchases, including the $200,000.00 lake house and $72,000.00 pole barn were paid for in cash, mostly 100's and 50's.

## GAMBLING

39.     SCARPELLI and LEIS were familiar players at the Hollywood Casino due to their excessive level of play and frequent visits to the casino itself.  Hollywood Casino is located at 777 Hollywood Drive, Lawrenceburg Indiana, on the river across the Ohio border in Indiana. Hollywood Casino's records reveal that in 2009, SCARPELLI and LEIS gambled at the casino roughly every three days.  By 2014, SCARPELLI and LEIS gambled at the casino roughly every two days and often on a daily basis.

40.     Shelli Ward and John Ward (WARDS) went to the casino with SCARPELLI and LEIS.

41.     SCARPELLI, LEIS and the WARDS each had a Player's card at the Hollywood Casino. Using a Player's card allows the player to receive perks at Hollywood Casino based on the amount of play.  Frequent perks are free hotel rooms, free meals, free cruises, and tickets sporting and entertainment events, invitations to events limited to the biggest gamblers, and cash to play on the machines.  All these perks are to encourage the big gamblers to come to the casino.

42.     SCARPELLI's player number for Hollywood Casino is ***9639.  SCARPELLI'S "Universal Player" card number is IS*****2432.  The Universal Player card allows SCARPELLI to get perks at all Hollywood Casinos regardless of its location.

43.     LEIS' player number for Hollywood Casino is ***6192.  LEIS' Universal Player card number is IS*****2780.  This allows LEIS to get perks at all the Hollywood Casinos.

44.     SCARPELLI and LEIS each gambled so much money at Hollywood Casino that they each were awarded "Icon" status.  Gaining "Icon" status gave them access to all the best perks, including vouchers for free cruises for the player and a friend, tickets to sporting and entertainment events, cash to play on the machines and free hotel rooms.

45.     Hollywood Casino designates someone as an "Icon" status player if the player has logged in over $400,000.00 of "coin in" the past six months. If the player does not log in over $400,000.00 of coin in during the next six months, they lose their "Icon" Status.

46.     For the purposes of determining a player's status, "coins in" means the amount of currency put into the slot machines, winnings on the money put in, and the winnings played on the machine. For example, if a player puts $100.00 in a machine, wins $20.00, and plays that $20.00 without cashing out, the player gets credit for $120.00 of "coins in". Therefore, for both SCARPELLI and LEIS to each independently achieve "Icon" status, both SCARPELLI and LEIS each had more than $400,000.00 of "coins in" the machines every six months.

### SCARPELLI'S GAMBLING

47.  According to Hollywood Casino's records, as of May 2014, during the period of 2009 to 2014, SCARPELLI had approximately $12,287,112.37 in "coins in". The following Chart illustrates SCARPELLI's gambling at the Hollywood Casino.

### Amy M Scarpelli
### Hollywood Casino Activity Report
### Gaming Activity Totals

| Year | Coins In | Coins Out | Loss | Adjusted Win/Loss |
|------|----------|-----------|------|-------------------|
| 2014 | $ 1,341,728.50 | $ 749,390.40 | $ 591,826.20 | $ 22,351.30 |
| 2013 | $ 4,787,923.74 | $ 2,770,054.83 | $ 2,017,869.06 | $ 201,638.06 |
| 2012 | $ 4,473,964.83 | $ 3,078,692.83 | $ 1,395,271.95 | $ 335,324.93 |
| 2011 | $ 1,140,347.73 | $ 962,638.43 | $ 177,709.30 | $ 72,632.30 |
| 2010 | $ 336,334.15 | $ 299,419.17 | $ 36,914.98 | $ 31,714.88 |
| 2009 | $ 206,313.30 | $ 189,980.19 | $ 16,333.11 | $ 12,233.11 |
| TOTALS | $ 12,287,112.37 | $ 8,050,633.77 | $ 4,236,436.60 | $ 623,944.10 |

Red numbers indicate negative numbers (Loss)

48.     As noted above "coins in" includes winnings on the machines that were played and "coins out" includes playing and losing those winnings, addition to the actual cash put into the machines. SCARPELLI had over $8,050,655.77 in "coins out". This means that SCARPELLI netted over $4,236,486.00 in losses.

49.     Hollywood Casino's records also reveal that the casino filed 179 Currency Transaction Reports (CTRs). Just like a bank, the casinos are required to report currency deposits in excess of $10,000.00 on a single occasion. According to the CTRS filed by Hollywood Casino, SCARPELLI deposited an amount in excess of $10,000.00 a total of 179 times. The total of the 179 deposits was $2,882,826.00.

50.     The $2,882,826.00 amount reported by the CTRs does not have anything to do with any money SCARPELLI may have won while playing the machines. The CTRs report only the

amount of "physical cash" SCARPELLI deposited at the casino on a single day in excess of $10,000.00.

51.     Because the $2,882,826.00 in CTRs filed on SCARPELLI includes only deposits in excess of $10,000.00, the total of the CTRs under reports the amount of cash SCARPELLI deposited at the casino. The $2,882,826.00 does not include deposits less than $10,000.00. If SCARPELLI deposited $9,000.00 into a machine on a single occasion it would not have been reported and is not included in $2,882,826.00.

52.     The "coins out" amount listed above does include winnings played and lost. It does not accurately portray SCARPELLI's true losses as compared to the amount of cash she brought to the casino. The last column, the "Adjusted Win/Loss" column was provided by the casino as the amount SCARPELLI actually lost out of the money that she brought in to play.

53.     As illustrated above in the "Adjusted Win/Loss" column, SCARPELLI lost money gambling every year except for 2014. As of May, 2014, SCARPELLI's winnings exceeded her losses by almost $23,000.00. As of September 29, 2014, SCARPELLI is only slightly ahead for the year with net winnings in the amount of $5,564.15.

## LEIS' GAMBLING

54.     According to Hollywood Casino's records as of May, 2014, LEIS had approximately $7,702,695.22 in "coins in" during the period of 2009 to 2014. However, during this same period, LEIS had over $5,602,110.78 in "coins out". The following Chart illustrates LEIS' gambling at the Hollywood Casino.

### Deanna K Leis
### Hollywood Casino Activity Report
### Gaming Activity Totals

| Year | Coins In | Coins Out | Win/Loss | Adjusted Win/Loss |
|------|----------|-----------|----------|-------------------|
| 2014 | $ 941,502.83 | $ 611,462.80 | $ 330,040.03 | $ 92,627.93 |
| 2013 | $ 2,530,020.69 | $ 1,645,909.10 | $ 884,111.59 | $ 162,093.39 |
| 2012 | $ 2,497,987.83 | $ 1,831,555.21 | $ 666,432.64 | $ 231,552.64 |
| 2011 | $ 1,172,525.21 | $ 1,004,379.80 | $ 168,145.41 | $ 98,794.41 |
| 2010 | $ 354,511.65 | $ 318,633.54 | $ 35,878.11 | $ 34,978.11 |
| 2009 | $ 206,146.97 | $ 190,170.33 | $ 15,976.64 | $ 12,383.16 |
| TOTALS | $ 7,702,695.22 | $ 5,602,110.78 | $ 2,100,584.44 | $ 507,877.94 |

Red numbers indicate negative numbers (Loss)

55.    Again, "coins in" includes LEIS's winnings on the machines that were played in and "coins out" includes playing and losing those winnings, addition to the actual cash put into the machines. LEIS netted over $2,100,584.44 in losses.

56.    Hollywood Casino's records also reveal that the casino filed 124 Currency Transaction Reports (CTRs) on LEIS.  These are the Casino's reports of LEIS' currency deposits in excess of $10,000.00 on a single occasion.  According to the CTRs filed by Hollywood Casino, LEIS deposited an amount in excess of $10,000.00 a total of 124 times.  The total of the 124 deposits was $1,839,271.00.

57.    The $1,839,271.00 amount reported by the CTRs does not have anything to do with any money LEIS may have won while playing the machines.  The CTRs report only the amount of "cash" LEIS deposited at the casino on a single day in excess of $10,000.00.

58.    Because the $1,839,271.00 in CTRs filed on LEIS includes only deposits in excess of $10,000.00, the total of the CTRs under reports the amount of cash LEIS deposited at the casino. The $1,839,271.00 does not include deposits less than $10,000.00.  If LEIS deposited $9,000.00 into a machine on a single occasion it would not have been reported and is not included in $1,839,271.00.

59.    The "coins out" amount listed above does include winnings played and lost.  It does not accurately portray LEIS' true losses as compared to the amount of cash she brought to the casino.  The last column, the "Adjusted Win/Loss" column was provided by the casino as the amount LEIS actually lost out of the money that she brought in to play.

60.    As illustrated above in the "Adjusted Win/Loss" column, LEIS lost money gambling every year except for 2014.  As of May, 2014, LEIS' winnings had exceed her losses by $32,627.00. However, as of September 29, 2014, LEIS is now behind for the year with net losses in the amount of -$1,052.55.

61.    In April 2014, WCPD Detective Bell and your affiant conducted at trash pull at SCARPELLI and LEIS' residence on Dinsmore Road in West Carrollton, Ohio.  The trash containers included:

   a.    A flyer to come down to Hollywood Casino with $2,000.00 of dollars of free play in April 2014;

   b.    A ton of tickets with Player's Card #***9639, registered to SCARPELLI, for the March 27, 2014 drawing at Hollywood Casino, which is another perk to get large gamblers to the Casino (according to the terms of the drawing, you put your tickets into a bucket as soon as 4 pm on the day of the drawing.  The drawing will occur between 6 pm and 9 pm.  You need to be present to win.  There will be twenty (20) winners of $500.00 each and one (1) ten thousand dollar winner);

   c.    Multiple empty cash envelopes originating from US Bank; and

d.   One (1) handwritten note depicting the words "Criminal Attorney".



62.   During April 2011 through April 18, 2014 the WARDS went 2 to 3 times a week to Hollywood Casino to gamble with SCARPELLI and LEIS. Each time they gambled, SCARPELLI gave LEIS and the WARDS cash to put into the slot machines. At the end of the evening, SCARPELLI gave the WARDS their share of the "winnings". Their "winnings" were deposited into the HFCU #6490.

63.   The WARDS used PNC Bank as their primary bank. Shelli Ward is a bus driver and John Ward is a self-employed painter. At SCARPELLI'S request, they opened accounts at US Bank. In addition, on March 25, 2011 they opened the HFCU #6490 in the name of John and Shelli WARD. The WARDS used the HFCU #6490 to deposit their "winnings" from the casino. The WARDS conducted the following transactions in the HFCU #6490:

| | |
|---|---|
| 03/25/11 | $2,001 cash deposited by Shelli Ward |
| 04/01/11 | $1,500 cash deposited by John Ward |
| 04/07/11 | $1,500 cash deposited by John Ward |
| 04/10/11 | $3,000 cash withdrawn |
| 04/14/11 | $1,000 cash deposited |
| 04/18/11 | $2,000 cash deposited by John Ward |
| 06/11/11 | $1,000 cash deposited by John Ward |
| 07/14/11 | $1,000 cash deposited by John Ward |
| 07/29/11 | $500 cash deposited by John Ward |
| 09/02/11 | $500 cash deposited by Shelli Ward |
| 09/28/11 | $3,000 cash withdrawn by Shelli Ward |
| 11/14/11 | $500 cash deposited by John Ward |
| 11/30/11 | $1,000 cash deposited by Shelli Ward |

| | |
|---|---|
| 12/08/11 | $500 cash deposited by John Ward |
| 12/14/11 | $500 cash deposited by John Ward |
| 12/19/11 | $1,500 cash deposited by John Ward |
| 01/27/12 | $1,000 cash deposited by John Ward |
| 02/17/12 | $1,000 cash deposited by John Ward |
| 04/30/12 | $3,000 cash deposited by Shelli Ward |
| 05/11/12 | $2,000 cash deposited by Shelli Ward |
| 06/04/12 | $2,000 cash deposited by John Ward |
| 06/16/12 | $2,500 cash deposited by Shelli Ward |
| 06/22/12 | $1,500 cash deposited by John Ward |
| 07/23/12 | $2,000 cash deposited by John Ward |
| 08/07/12 | $2,000 cash deposited by John Ward |
| 08/20/12 | $2,000 cash deposited by John Ward |
| 08/31/12 | $1,000 cash deposited by John Ward |
| 09/10/12 | $2,500 cash deposited by Shelli Ward |
| 09/17/12 | $2,500 cash deposited by John Ward |
| 09/28/12 | $2,500 cash deposited by John Ward |
| 10/05/12 | $2,500 cash deposited by John Ward |
| 10/26/12 | $2,500 cash deposited by John Ward |
| 11/15/12 | $2,500 cash deposited by John Ward |
| 11/23/12 | $2,500 cash deposited by John Ward |
| 12/28/12 | $2,500 cash deposited by John Ward |
| 02/08/13 | $2,500 cash deposited by John Ward |
| 02/26/13 | $15,500 withdrawn to purchase defendant 2007 Nissan Truck #5525 |
| 02/27/13 | *John Ward purchased 2007 Nissan Titan Truck for $16,535.00* |
| 03/12/13 | $2,500 cash deposited by John Ward |
| 03/29/13 | $2,500 cash deposited by John Ward |
| 04/29/13 | $2,500 cash deposited by John Ward |
| 06/11/13 | $10,000 withdrawn by check payable to Charles Leis |
| 06/29/13 | $5,000 cash deposited by Shelli Ward |
| 08/12/13 | $6,000 withdrawn by check payable to Tom Ward (Wards' son) |
| 10/08/13 | $6,000 check deposited by Shelli Ward |
| 12/12/13 | $18,000 withdrawn |
| 12/13/13 | *Shelli Ward purchased 2011 Outback Camper for $19,305.00* |
| 01/13/14 | $5,000 cash deposited by Shelli Ward |
| 01/27/14 | $3,000 cash deposited by John Ward |
| 01/30/14 | *$5,000 check withdrawn to purchase 4912 Dinsmore Road* |
| 01/31/14 | $2,000 cash deposited by John Ward |
| 02/18/14 | $2,500 cash deposited by John Ward |
| 02/24/14 | $2,500 cash deposited by John Ward |
| 02/26/14 | *$32,162.23 withdrawn to purchase 4912 Dinsmore Road* |
| 03/12/14 | $10,725.00 withdrawn |
| 03/12/14 | *Shelli Ward purchased 1991 Islander boat for $10,725.00* |
| 04/15/14 | $3,900 check withdrawn by John Ward |
| 06/24/14 | $1,000 cash withdrawn by Shelli Ward |
| 07/14/14 | $3,000 cash withdrawn by Shelli Ward |

| | |
|---|---|
| 07/28/14 | $1,500 cash withdrawn by Shelli Ward |
| 08/14/14 | $1,000 cash withdrawn by Shelli Ward |
| 08/22/14 | $4,000 cash withdrawn by Shelli Ward |
| 08/28/14 | $2,000 cash withdrawn by Shelli Ward |
| 09/26/14 | $1,000 cash withdrawn by Shelli Ward |

64.    The 1991 Islander Boat, the 2011 Outback Camper and the 2007 Nissan truck are currently titled to the WARDS. The 1991 Island boat was purchased on March 12, 2014 by Shelli WARD for $10,725.00. The 2011 Outback Camper was purchased on December 13, 2013 by Shelli WARD for $19,305.00. The 2007 Nissan truck was purchased on February 27, 2013 by John WARD for $16,535.00. The funds used to purchase the boat, camper and truck were withdrawn from the HFCU #6490 account into which the proceeds of the bank embezzlement and "winnings" from the casino had been deposited.

65.    Shelli WARD withdrew $37,500.00 from the HFCU #6490 account to purchase 4912 Dinsmore Road, West Carrollton, Ohio 45449. The property is titled to Shauna Ward. The $37,500.00 used to purchase 4912 Dinsmore Road and to renovate the property were the proceeds of the bank embezzlement and the "winnings" from the casino.

66.    When SCARPELLI was terminated from her job as US Bank Branch manager in April 2014, Shelli WARD drove Amy home from the bank. At that time, SCARPELLI and LEIS lived at 5041 Dinsmore Road, right across the street from the WARDS.

67.    Shortly after SCARPELLI was fired, the WARDS stopped going to the casino, and the deposits into the HFCU #6490 account stopped. However, the WARDS continued to make withdrawals until Scarpelli was arrested in October, 2014. Specifically, the WARDS made seven withdrawals from the HFCU #6490 totalling $13,500.00

## INCOME

68.    SCARPELLI's legitimate income from US Bank was roughly $61,000.00 to $69,000.00 per year since 2009. SCARPELLI does report gambling winnings to the State of Ohio for 2011 and 2012. However, unlike federal taxes, the State of Ohio does not allow a gambler to offset their gambling winnings with their losses for tax purposes. As noted above, SCARPELLI had more gambling losses than winnings every year between 2009 and 2013. SCARPELLI did not file a State tax return for the year 2013.

69.    LEIS has not reported income from employment for any year since 2008. LEIS filed returns for 2011 and 2012. The State of Ohio returns filed by LEIS do show gambling income. However, LEIS had more gambling losses at the Hollywood Casino than winnings every year since 2009.

70.    USSS Diane Cooper performed an analysis of LEIS' bank records. Based on those records, LEIS has not been employed since 2008.

71.     According to the Lake Waynoka Campground Manager, Piatt, LEIS always paid her camping fees in cash. LEIS had once commented to Piatt that she (LEIS) and her son, Jordon, save all winter in order to pay her (LEIS') camping fees. However, in 2011 (the year SCARPELLI stepped up her withdrawals from the LIT account) LEIS became a property owner herself. Since then LEIS has bought and sold a couple of used campers. LEIS made significant improvements to her campsite. In 2013, LEIS bought a lake front house and has built a huge storage building. When LEIS comes into Piatt's office to pay, LEIS always has a large amount of cash.

72.     In addition to LEIS paying her own fees for 2014 in cash, LEIS also paid the $820.00 annual membership fees and the $861.00 camping fees for Nona (Debbie) Spriggs. LEIS told Piatt that she was helping her Aunt Deb because she has been sick.

73.     Piatt said she has been told two different stories as to how LEIS got her new found wealth. One story is that SCARPELLI, who works for a bank, has tapped into someone's account that has passed away with no family or heirs. The other story is that LEIS hit it big gambling. Piatt has been told that LEIS has not worked at a job for at least five years.

74.     LEIS is SCARPELLI'S current domestic partner. SCARPELLI and LEIS maintain two residences, the house on Dinsmore Rd, in West Carrollton, OH and the lake house at 18 Horse Shoe Cove Lake Waynoka, Ohio. Both of the houses where they live together are titled to LEIS.

75.     SCARPELLI'S close relationship with LEIS dates back to at least 2005. On June 27th 2005, SCARPELLI was disciplined for issuing excessive fee refunds to LEIS. SCARPELLI's user ID #FN7484 was used to issue excessive fee refunds to Deanna LEIS. LEIS' checking account, US Bank Acct #3132, incurred $735.00 in overdraft and related fees between March 30, 2005 and June 6, 2005. However, SCARPELLI issued $2,577.00 in refunds, which amount exceeded LEIS' overdraft fees by $1,842.00.

76.     Prior to living with LEIS, SCARPELLI lived with her previous "domestic partner" MCCULLY. During the 1990's, SCARPELLI and MCCULLY purchased a house on Mallet Club Drive, Dayton, Ohio. SCARPELLI and MCCULLY obtained a mortgage on the property through Midland Mortgage. As of September 2014, SCARPELLI remains listed as the co-owner of this property. Until April, 2014, SCARPELLI's bank statements from her personal checking account at US Bank were mailed to the Mallet Club location.

77.     During SCARPELLI's interview with US Bank on April 23, 2014, SCARPELLI advised that she lived at the Dinsmore residence with LEIS, her partner. Shortly after this interview, SCARPELLI began having her bank statements from US Bank sent to the Dinsmore address. Property records list the Dinsmore residence as owned by CHARLES LEIS. Through witness interviews, I know that LEIS is the daughter of CHARLES LEIS.

## A.    CONCEALING SUA PROCEEDS

### AMY SCARPELLI

78.    In addition to gambling with the proceeds of her violations, SCARPELLI engaged in money laundering by attempting to conceal the source, ownership and control of the SUA proceeds by causing cash proceeds to be deposited into her own accounts at US Bank, and into US bank accounts belonging to LEIS, CHARLES LEIS and the WARDS.

## B.    MONEY SPENDING

79.    In addition to conducting financial transactions with the proceeds of the unlawful activity in violation of 18 U.S.C. § 1956, SCAREPLLI, LEIS, and others violated 18 U.S.C. § 1957 when they conducted financial transactions in excess of $10,000.00 with SUA proceeds exceeding $10,000.00.  The violations of 18 U.S.C. § 1957 occurred when:

     a.    The house at 4912 Dinsmore Road, was purchased by LEIS and the WARDS for $37,500.00;

     b.    The WARDS withdrew cash proceeds from their account at HFCU #6490 in amounts in excess of $10,000.00;

     c.    The 1991 Islander boat was purchased on March 12, 2014 by Shelli WARD for $10,725.00;

     d.    The 2011 Outback Camper was purchased on December 13, 2013 by Shelli WARD for $16,535.00; and

     e.    The 2007 Nissan truck was purchased on February 27, 2013 by John WARD for $16,535.00.

80.    USSS Investigative Support Division Diana Cooper advised your Affiant that the assets listed above in paragraph 79 have no outstanding liens.

### CONCLUSION

81.  Based on the above information, your affiant believes that probable cause exists that:

     a.    The following violations have been committed:

     (1)   18 U.S.C. § 656 (Bank Embezzlement);

     (2)   18 U.S.C. § 1005 (Fraudulent Bank Transactions);

(3)   18 U.S.C. § 1343 (Wire Fraud);

(4)   18 U.S.C. § 1344 (Bank Fraud);

(5)   18 U.S.C. § 371 (Conspiracy);

(6)   31 U.S.C. § 5324(a)(3) (Structuring a Financial Transaction);

(7)   31 U.S.C. § 5324(a)(1) (Causing Financial Institution to Evade Reporting Req.);

(8)  18 U.S.C. § 1956 (Money Laundering);

(9)  18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering); and

(10)  18 U.S.C. § 1957 (Laundering Monetary Instruments in Excess of $10,000.00); and

b.      there is probable cause to believe that the assets listed above in paragraph 3 are subject to forfeiture pursuant to:

(1) 18 U.S.C. § 981(a)(1)(C)(civil forfeiture) as property, real or personal which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 656 (Embezzlement), 18 U.S.C. § 1005 (Fraudulent Bank Transactions); 18 U.S.C. § 1344 (Bank Fraud) or any offense constituting "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7)  which includes 18 U.S.C. § 1343 (Wire Fraud); 18 U.S.C. § 1956 (Money Laundering), 18 U.S.C. § 1957 (Laundering SUA Proceeds in Excess of $10,000.00); or a conspiracy to commit such offense;

(2) 18 U.S.C. § 981(a)(1)(A)(civil forfeiture) as property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956 or 18 U.S.C. § 1957, or any property traceable to such property; and/or

(3)  31 U.S.C. § 5317(c)(2)(civil forfeiture) as property involved in a violation of  31 U.S.C. § 5313 or 31 U.S.C. § 5324, or any conspiracy to commit such violation, and  any property traceable to any such violation or conspiracy.

Your Affiant further sayeth naught.

Matthew L. Schierloh
Special Agent
United States Secret Service

Subscribed and sworn to before me this _07_ day of December, 2016

MICHAEL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE